# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.


JULIO BALTIERRA;


    Plaintiff,

v.

ADAMS COUNTY, COLORADO; a government entity;
SHERIFF MICHAEL MCINTOSH, in his official and individual capacity;
JEFFREY STEIN, in his individual capacity;
KEVIN LASE, in his individual capacity;
DAVE DRAUDT, in his individual capacity;
SHANA ANDERSON, in her individual capacity;
GARY RUSSELL, in his individual capacity;
JOHN WEINSTEIN, in his individual capacity;
JOSHUA WRIGHT, in his individual capacity;
ANDREW TITUS, in his individual capacity;
PATRICK DEAL, in his individual capacity;
ADAM MOHR, in his individual capacity;
ADAN HOLGUIN, in his individual capacity;
GARY BROWN, in his individual capacity;
JAMES CASTELLANO, in his individual capacity;
DOMINIC ROMERO, in his individual capacity;
JAMES THOMPSON, in his individual capacity;
BRANDON SKALAK, in his individual capacity;
RYAN ENDRES, in his individual capacity;
HERBERT CRAWFORD, in his individual capacity;
CORIZON HEALTH, INC.;
BENJAMIN CLOWER, in his individual capacity;
STEPHANIE OSTROM, in her individual capacity;
BARBARA WISNIESKA, in her individual capacity;
JAMES FRONCEK, in his individual capacity;
TARA YELLOW, in her individual capacity;
LARA DERALD, in her individual capacity;
HEATHER LYNN FLANAGAN-WAGNER, in her individual capacity;
HANNAH PALKER, in her individual capacity;
TIFFANY JONES, in her individual capacity;
STACY POTTER, in her individual capacity;
KALEE PETERSON, in her individual capacity;


    Defendants.

---

**CIVIL RIGHTS COMPLAINT**
**WITH REQUEST FOR TRIAL BY JURY**

---

Plaintiff Julio Baltierra, by and through his attorney Benjamin Hartford, The Law Office of

Benjamin Hartford LLC, complains against Defendants and requests a trial by jury as follows:

## INTRODUCTION

1. Julio Baltierra was sentenced to a 30 day jail sentence because he couldn't pay restitution
   on his criminal case.

2. Baltierra suffered a likely bite by a spider while incarcerated the Adams County Detention
   Facility (ACDF).

3. Baltierra attempted many times over the course of three days to get medical attention for
   this acute and serious condition of necrotizing fasciitis, and was repeatedly denied by
   both ACDF Jail Deputies, as well as Medical Staff of Corizon Health Inc hereafter
   referred to as Corizon.

4. Baltierra repeatedly begged and pleaded for help to both deputies and medical staff and
   was ignored and it was only after he became delirious in his cell that some of his savvy
   cellmates said he was having chest pains so he would be taken for medical care.

5. Once he was assessed the medical staff failed to provide even basic medical care and was
   deliberately indifferent to his condition, with one nurse even complaining to Baltierra that
   she couldn't get a line to administer antibiotics and throwing the IV bag at the Plaintiff.

6. Necrotizing fasciitis is not generally difficult to diagnose and if caught early and treated
   with antibiotics aggressively can be treated effectively, conversely if left unchecked or
   untreated it can have devastating effects on an individual.

7. In Baltierra's case after he begged and pleaded for help and was repeatedly denied and rejected, the ultimate result was the complete removal of his right buttock and a skin graft. This injury was easily and completely preventable.

8. Corizon and the Adams County Sheriff's Officer's failed the Plaintiff and Corizon's history of systemic and deliberate denial of basic medical care in the pursuit of profits that has been explicitly documented and was undeniably known to the Adams County Sheriff's Office (ACSO) and Adams County prior to the initiation of the medical services contract. This all being known to ACSO and Adams County they still made the choice to contract with Corizon and this decision has resulted in numerous preventable injuries to a jail population that is more predisposed to be exploited considering their compromised and captive condition.

## JURISDICTION AND VENUE

9. This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983.

10. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1367. Jurisdiction supporting Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

11. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

## PARTIES

**Plaintiffs**:

12. At all times pertinent hereto, the decedent, Julio Baltierra, was a citizen of the United States of America and a resident of the State of Colorado confined to the Adams County Detention Facility.

**Defendants**:

*Adams County*

13. Defendant Adams County, Colorado ("Adams County") is a political subdivision of the State of Colorado and is the public entity responsible for Adams County and the Adams County Detention Facility ("ACDF"). ACDF is operated by the Adams County Sheriff's Department.

14. At all times relevant to the subject matter of this litigation, Defendant Michael McIntosh was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant McIntosh was acting under color of state law in his capacity as the Adams County Sheriff. Defendant McIntosh was responsible for training and supervising all other Defendants and other employees of the Adams County Sheriff's Department working at ACDF, for setting jail policy for the county and the overall management of ACDF, and for insuring the health and welfare of all persons detained in ACDF.

15. Defendant Adams County and Defendant McIntosh, in his official capacity, are collectively referred to as "Adams County Defendants."

16. At all times relevant to the subject matter of this litigation, Defendant Jeffrey Stein was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant

Stein was acting under color of state law in his capacity as a Deputy employed by the Adams County Sheriff's Office.

17. At all times relevant to the subject matter of this litigation, Defendant Kevin Lase was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Lase was acting under color of state law in his capacity as a Deputy employed by the Adams County Sheriff's Office.

18. At all times relevant to the subject matter of this litigation, Defendant Dave Draudt was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Draudt was acting under color of state law in his capacity as a Deputy employed by the Adams County Sheriff's Office.

19. At all times relevant to the subject matter of this litigation, Defendant Shana Anderson was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Anderson was acting under color of state law in his capacity as a Detention Specialist employed by the Adams County Sheriff's Office.

20. At all times relevant to the subject matter of this litigation, Defendant Gary Russell was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Russell was acting under color of state law in his capacity as a Deputy employed by the Adams County Sheriff's Office.

21. At all times relevant to the subject matter of this litigation, Defendant John Weinstein was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Weinstein was acting under color of state law in his capacity as a Deputy employed by the Adams County Sheriff's Office.

22. At all times relevant to the subject matter of this litigation, Defendant Joshua Wright was

a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Wright was acting under color of state law in his capacity as a Deputy employed by the Adams County Sheriff's Office.

23. At all times relevant to the subject matter of this litigation, Defendant Andrew Titus was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Titus was acting under color of state law in his capacity as a Detention Specialist employed by the Adams County Sheriff's Office.

24. At all times relevant to the subject matter of this litigation, Defendant Patrick Deal was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Deal was acting under color of state law in his capacity as a Deputy employed by the Adams County Sheriff's Office.

25. At all times relevant to the subject matter of this litigation, Defendant Adam Mohr was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Mohr was acting under color of state law in his capacity as a Deputy employed by the Adams County Sheriff's Office.

26. At all times relevant to the subject matter of this litigation, Defendant Adan Holguin was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Holguin was acting under color of state law in his capacity as a Deputy employed by the Adams County Sheriff's Office.

27. At all times relevant to the subject matter of this litigation, Defendant Gary Brown was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Brown was acting under color of state law in his capacity as a Deputy employed by the Adams County Sheriff's Office.

28. At all times relevant to the subject matter of this litigation, Defendant James Castellano was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Castellano was acting under color of state law in his capacity as a Deputy employed by the Adams County Sheriff's Office.

29. At all times relevant to the subject matter of this litigation, Defendant Dominic Romero was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Romero was acting under color of state law in his capacity as a Deputy employed by the Adams County Sheriff's Office.

30. At all times relevant to the subject matter of this litigation, Defendant James Thompson was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Thompson was acting under color of state law in his capacity as a Deputy employed by the Adams County Sheriff's Office.

31. At all times relevant to the subject matter of this litigation, Defendant Brandon Skalak was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Skalak was acting under color of state law in his capacity as a Deputy employed by the Adams County Sheriff's Office.

32. At all times relevant to the subject matter of this litigation, Defendant Ryan Endres was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Endres was acting under color of state law in his capacity as a Deputy employed by the Adams County Sheriff's Office.

*Corizon*

33. Defendant Corizon Health, Inc. ("Corizon"), formerly Corizon Medical Services, Inc., is

a for-profit Tennessee corporation doing business in the State of Colorado, with its principal street address located at 105 Westpark Drive, Suite 200, Brentwood, TN 37207. Corizon performs the typically governmental function of assuming responsibility for inmate health care. Corizon contracts with Adams County to provide medical services to inmates and detainees at ACDF and supervises and implements such care.

34. Corizon is a proper entity to be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies, practices, habits, customs, procedures, training, and supervision of staff, including individual Defendants, with respect to the provision of medical care and treatment for inmates with serious emergency medical needs.

35. At all relevant times, Corizon was acting under color of state law and performing a central function of the state, thus making them liable under § 1983. The conduct of Corizon and its employees and agents, is chargeable to the government, and Corizon was acting jointly with the government actors.

36. At all times relevant to the subject matter of this litigation, Defendant Benjamin Clower was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Clower was acting under color of state law in his capacity as a Medical Doctor employed by Corizon.

37. At all times relevant to the subject matter of this litigation, Defendant Barbara Wisnieska was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Wisnieska was acting under color of state law in her capacity as a Registered Nurse employed by Corizon.

38. At all times relevant to the subject matter of this litigation, Defendant Stephanie Ostrom was a citizen of the United States and a resident of Colorado. At all relevant times,

Defendant Ostrom was acting under color of state law in her capacity as a Registered Nurse employed by Corizon.

39. At all times relevant to the subject matter of this litigation, Defendant Tara Yello was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Yellow was acting under color of state law in her capacity as a Registered Nurse employed by Corizon.

40. At all times relevant to the subject matter of this litigation, Defendant Lara Derald was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Derald was acting under color of state law in her capacity as a Nurse employed by Corizon.

41. At all times relevant to the subject matter of this litigation, Defendant Heather Lynn Flanagan-Wagner was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Flanagan-Wagner was acting under color of state law in her capacity as a Registered Nurse employed by Corizon.

42. At all times relevant to the subject matter of this litigation, Defendant Hannah Palker was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Palker was acting under color of state law in her capacity as a Nurse employed by Corizon.

43. At all times relevant to the subject matter of this litigation, Defendant Tiffany Jones was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Jones was acting under color of state law in her capacity as a Nurse employed by Corizon.

44. At all times relevant to the subject matter of this litigation, Defendant Kalee Peterson was

a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Peterson was acting under color of state law in her capacity as a Nurse employed by Corizon.

45. At all times relevant to the subject matter of this litigation, Defendant Stacy Potter was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Potter was acting under color of state law in her capacity as a Registered Nurse employed by Corizon.

46. At all times relevant to the subject matter of this litigation, Defendant James Froncek was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Froncek was acting under color of state law in his capacity as a Registered Nurse employed by Corizon.

## FACTUAL ALLEGATIONS

47. Plaintiff was convicted of DUI and Careless Driving in Adams County. The Court ordered probation and restitution due to damage caused by Baltierra's accident on the night in question.

48. Plaintiff completed probation and all of the required terms, Plaintiff's probation officer informed him that his probation would be extended so additional restitution would be paid.

49. Plaintiff objected to continuing with probation since he had successfully completed all of the requirements and the only outstanding issue was his restitution balance.

50. Baltierra's probation officer informed the Court of his position and the Court sentenced

him to a 30 sentence rather then extending his probation term.

51. Baltierra's sentence was imposed on March 20th, 2016 when he was taken into custody at the Adams County Detention Facility (ACDF).

52. On the evening of March 20th, 2016 Baltierra was in custody at the ACDF and woke up due to a sharp pain in his right buttock, he had a small pimple sized bite mark on his buttock, he at this point told the jail deputy that he had a severe pain in his right buttock and he needed to be taken to medical for help.

53. The jail deputy told him he would be fine and refused to take him to medical for diagnosis or help.

54. The following day Baltierra's condition became acutely worse, he had a fever, felt pain in his joints, had extreme pain in his buttock and he again begged the jail deputy to take him to medical for help, he told the deputy that his wound on his buttock had enlarged to the size of a fifty cent piece.

55. The Deputy told him that he would be fine and that he wasn't taking him to medical, Baltierra told the Deputy that he needed medical help and he begged him again to take him to medical and he was again refused.

56. The following day Baltierra's condition had again acutely worsened, the wound on his buttock had grown from the size of a fifty cent piece to the size of a softball, he pain rose to unbearable levels, he was in excruciating pain and again he requested to be taken to medical, and again his request was denied by the jail deputy. He was told medical was full and couldn't accommodate him at that time.

57. In Baltierra's medical notes, there is a reference to Dr. Clower being advised of his condition and noting that his wound site had significantly worsened and expanded, he

was in severe pain, and it was at that point he ordered Baltierra be provided with Tylenol and he recommended starting an I.V. line with vancomycin, and while this was recommended Baltierra denies any I.V. was given nor did he receive any antibiotics at any time while in the jail or jail medical unit.

58. Additionally, Baltierra again begged Dr. Clower to send him to the hospital, Dr. Clower summarily dismissed his request, as is standard procedure for Corizon employees.

59. Baltierra soon after became delirious, the following day his wound on his buttock had grown to the size of a soccer ball, he was in and out of consciousness, the jail deputies would still not take Baltierra to medical, so his cellmates fearing he would die called the emergency phone line and said Baltierra was having chest pains as they believed that would spur the jail deputies or medical staff to finally take Baltierra to the medical unit.

60. Thankfully, Baltierra's cellmates ploy worked and he was finally taken to the medical unit at 2:54am where he was seen first by Nurse Stephanie Ostrom, who reported that Baltierra was in extreme pain and once again begged to go to the hospital because if not he would die, this request as per protocol was of course denied.

61. The following day Baltierra was first seen by Nurse James Froncek and his notation in the Plaintiff's Medical file outlines the progression and worsening of the wound site and Froncek.

62. Soon after Nurse Froncek note, Nurse Barbara Wisniewski noted abnormal VS and Baltierra was sent to the Hospital.

63. Baltierra recalls that prior to being released to the hospital, there was an order for an I.V. of antibiotics to be administered, and the nurse responsible for this was unable to place the line and yelled at Plaintiff and threw the I.V. bag at Baltierra rather than continue to

provide or attempt to provide medical care.

64. After Baltierra was taken to the hospital, he was suffering a medical emergency and his life was at risk if the infection progressed to his heart.

65. Baltierra's attending doctor took aggressive measures to save his life and was able to stave off the infection.

66. Baltierra's attending doctor due to the advanced progression of the infection on his buttock was forced to amputate his entire right buttock to remove the necrotic tissue and infection from Baltierra.



67. As a result Baltierra is now permanently disabled, and embedded is a picture of the condition of his wound site.

***Corizon's nationwide custom, policy, and/or practice is to provide unconstitutional, deliberately indifferent care so as to cut costs and increase Corizon's profits.***

68. Corizon is a for-profit, billion-dollar company that was formed in 2011 when its predecessor, Correctional Medical Services, Inc. ("CMS"), merged with PHS Correctional Healthcare ("PHS"). Under each of these names, Corizon has had a long and well-publicized history of sacrificing the health and lives of inmates for profit. Corizon,

which operates in hundreds of correctional facilities in dozens of states, uses the same profit-maximizing approach nationwide: "[T]heir whole goal," one Arizona judge has observed, "is how not to do any work."

69. . At the time of Baltierra's injury, Corizon knew that its deliberate strategy of cutting costs by, among other things, understaffing facilities, inadequately screening and training employees, denying inmates physician consultations, failing to provide necessary medication and/or treatment, and denying patients access to needed acute care, placed those in its care at serious risk of grave illness and even injury.

70. . These are the very customs, policies, and/or practices that seriously injuried Baltierra. Baltierra was injured because Corizon medical providers failed to diagnose and treat a serious and apparent emerging medical condition; failed to prescribe the proper medications; failed to administer medications; ignored his need for medical treatment for days, even as they witnessed his physical and mental deterioration and anguish; and failed to summon emergency medical assistance when they observed his condition rapidly deteriorating, even when he was on the brink of death and only after intervention of his cellmates and well after the point when his condition could have been treated without loss of his body part was he finally sent to the hospital.

71. Corizon emphasizes to its employees that patient care is be given less regard than profits. Corizon explicitly trains its employees to not provide care to inmates, so as to minimize care costs and increase the company's revenues.

72. These are customary and known practices adopted and employed by Corizon so as to maximize profits. Such practices include, but are not limited to, inadequately staffing facilities; employing unqualified staff; failing to train and/or vet staff; delaying and/or

denying life-saving care, even in emergency situations; and failing to prescribe medication, even when it is necessary.

73.  In 2012, the Eleventh Circuit affirmed a jury finding that Corizon pursues a policy of denying medical treatment to inmates, and even refusing to send prisoners on the brink of death to hospitals, in order to save money. In *Fields v. Corizon Health, Inc.*, 490 F. App'x 174 (11th Cir. 2012), the jury confirmed that this policy had caused the gruesome suffering and permanent paralysis of Brett Fields. Mr. Fields had complained of a severe bacterial infection for several weeks, but a PHS nurse refused to send him to the hospital and instead gave him Tylenol even as his legs began to twitch, he lost his ability to walk, and his intestines descended out of his rectum. The Eleventh Circuit affirmed the jury's finding that Mr. Fields's injuries resulted from PHS's policy of "delaying treatment to save money," which it "implemented... with deliberate indifference as to the policy's unknown or obvious consequences" for the company's patients. *Id*. at 184-85 (internal quotation marks and alterations omitted).

74.  Monitoring reports, state audits, and reviews of Corizon by states across the country reflect the same custom and policy of providing substandard care for the purpose of cutting costs.

75.  One hundred days after Florida brought in Corizon to provide care for a vast majority of its inmates, the monthly inmate injury count rose to a ten-year high, while the number of critically ill prisoners sent for hospital treatment plummeted. Monitoring reports found, consistent with Corizon's treatment of Baltierra, medical staff failed to make rounds, gave inmates medication without, or contrary to, the advice of doctors, and failed to transfer inmates who were suffering from dire health problems to acute care facilities.

76. A February 2012 report of Corizon's performance in Idaho concluded that the company was deliberately indifferent to the medical needs of prisoners. Just like Corizon's response to Baltierra's immediate medical needs, in Idaho, response to prisoners' requests for medical attention were delayed, or their requests were entirely ignored; the same was true in emergency care situations, as inadequately trained staff were slow to respond. The Idaho report found Corizon staffing inadequate and incompetent, and that the mental healthcare provided by Corizon was deficient. Corizon's operations in Idaho failed 22 of 33 audit categories in 2010 and 26 of 33 categories in 2011.

77. A 2014 report detailed failures of medical care by Corizon in Alabama prisons. It attributed multiple injurys and serious injuries to "extraordinary understaffing," which caused crises including the failure to monitor diabetic patients and slow or nonexistent emergency responses—the very same failed monitoring and lack of emergency care that caused Baltierra's injury.

78. In a November 2011 audit of CMS's performance in Maine prisons, it was found that: 11% of sick calls were never or not timely resolved; staff was inadequately trained; and medications were routinely improperly administered. When Maine decided not to renew Corizon's contract in 2012 and they instead contracted with another healthcare provider, inmate complaints about their medical care significantly dropped.

79. Physicians have refused to return inmates to Corizon's care, because Corizon customarily provides woefully inadequate care in an effort to increase profit margins. Debbie Daley was an inmate in Virginia who had been diagnosed with colorectal cancer. She was forced to wait eight months to see an outside physician because of delays by Corizon. When she finally made it to see outside physicians at the University of Virginia,

she was febrile, septic, and in great pain due to a cancer-related infection. Ms. Daley's doctor was so concerned about this medical neglect that she called the University of Virginia Ethics Consult Service for guidance, and refused to discharge Ms. Daley back to Corizon without an agreement that they would provide constitutional and prompt quality services to Ms. Daley.

80. Lawsuits throughout the country, in Alabama, Arizona, California, Florida, Idaho, Indiana, Iowa, Louisiana, Maine, Minnesota, Missouri, New Mexico, and New York, among other states, detail what one D.C. municipal lawmaker identified in 2015 as Corizon's "deeply troubling track record of human rights abuses." According to one Florida newspaper, Corizon was sued at least 660 times for malpractice from 2008-2013. A more recent survey counts 1,300 such lawsuits in those five years.

***Corizon, nationwide, has a custom, policy, or practice of refusing to provide inmates, regardless of their medical condition, with physician consultations.***

81. Corizon customarily delays treatment by physicians, and specialists, to keep healthcare costs down, at the expense of inmates' lives.

82. A 2014 investigation by the Palm Beach Post revealed that numerous Florida prisoners who had obvious end-stage cancer symptoms had those symptoms disregarded by Corizon employees. One of those prisoners, Jovon Frazier, complained for months of persistent and increasing pain in his left shoulder. Mr. Frazier, was never allowed to see a doctor, only nurses, and those nurses refused to provide treatment other than giving him Tylenol. When Mr. Frazier was finally taken to the hospital, a cancerous mass was found in his left shoulder. Mr. Frazier ultimately lost his left arm and, a little while later, his life.

83. In September 2013, Louisiana canceled its contract with Corizon, and six Corizon

employees subsequently resigned in light of seven health-care related injurys that occurred in the state's prisons over seven months in 2012. At least three of the injurys were preventable. One, in particular, bears chilling similarities to Baltierra's injury. On August 8, 2012, Samantha George, a severe diabetic also suffering from a bacterial infection, was injuried after complaining of fever and pain. While Ms. George lay in her cell partially naked and unresponsive, Corizon staff repeatedly peered into her cell but did nothing to assist her. The only doctor on duty was off-site and told the nurse who contacted him that he would examine Ms. George the following day. By then, Ms. George was dead.

84. Corizon's pattern of delayed or denied medical care killed at least nine additional people and caused serious or critical injuries to twenty-one others in Minnesota before the state cancelled its contract with Corizon in 2013. A 2014 audit of Corizon's performance in Minnesota found that the injurys and deaths were in large part attributable to inadequate staffing. In order to cut costs, on weekdays after 4:00 p.m. and on weekends, Corizon paid a single doctor to be on call for the entire state prison system.

85. According to published accounts, one Minnesota victim of this policy was Xavius Scullark-Johnson. In May 2013, Mr. Scullark-Johnson suffered seven seizures in his cell, where he was left for nearly eight hours with no care. He was found soaked in urine on the floor of his cell, but still no ambulance was called for several more hours. When the ambulance finally arrived, a Corizon nurse turned it away because allowing Mr. Scullark-Johnson to travel by ambulance to a hospital would have violated Corizon protocols designed to cut costs. Without access to hospital care, Mr. Scullark-Johnson soon was dead.

86. In another disturbing case that illustrates Corizon's custom, policy, or practice of not allowing inmates to see a treating physician, even when they are experiencing medical emergencies, an inmate in Michigan who was diagnosed with cardiovascular problems and manic-depressive disorder was experiencing psychosis when he was shackled to a table by his arms and legs in 4-point restraints. He was left shackled and naked in a 106 degree cell for four days, all the while Corizon staff knew he was being held this way in isolation. Even though Corizon staff knew he was having a medical emergency, the inmate, was never seen by a physician. He was died four days later.

87. Corizon's custom, policy, or practice of refusing to provide critically ill inmates with physician consultations is illustrated by another case where an inmate with a swollen "open wound" on his testicle from a MRSA infection, was never seen by a physician throughout his incarceration. In fact, the inmate did not even have his critical vital signs monitored or receive a personal physical examination from a nurse. Because of this denial of medical care, the inmate, Andre Ward, developed bilateral pneumonia. Only after he developed this extremely serious medical condition was he admitted to the hospital. Mr. Ward died fourteen days later.

***Corizon, nationwide, has a custom, policy, or practice of refusing to provide necessary medication and/or treatment.***

88. Corizon customarily consciously denies medication or provides nonprescription treatment, to keep healthcare costs down, at the expense of inmates' lives.

89. A 2015 investigation at Florida Women's Reception Center in Ocala, Florida, found that a woman with diabetes had gone almost three months without insulin, and mentally ill inmates were inexplicably taken off their prescribed psychiatric medications. Consistent with these Florida inmates.

90. In Arizona, Corizon medical providers refused to provide any prenatal care to a pregnant inmate because it was not cost-effective. After the inmate gave birth via cesarean section, Corizon medical staff closed the wound not by stitching it shut, but by placing butterfly bandages on it. The inmate's wound was soon infected and instead of sending her straight to the hospital, Corizon delayed treatment. Ultimately, the inmate was sent to the Corizon-run prison

hospital where her wound was *packed with sugar from the prison kitchen*. This occurred for over three weeks.

91. In a case that resulted in the largest wrongful death civil rights settlement in California state history, Corizon and Alameda County agreed to pay $8.3 million dollars to the surviving children of Martin Harrison, an inmate who died in Alameda County jail. Mr. Harrison was not given any treatment for his alcohol withdrawal and went into extreme delirium tremens. While suffering from this medical emergency, he began to have hallucinations and was tased and beaten by deputies at the jail. Mr. Harrison eventually died.

92. PHS, which was acquired by Corizon, told nurses at a Florida prison that only doctors could make the decision to send an inmate to the hospital and that they could not send an inmate to the hospital unless "you can see that they're dying any minute." PHS set this policy into place because "foolish" emergency trips "cost... so much money." As a result, when an inmate's intestines fell out of his rectum and his legs went numb, the nurse ordered Tylenol and manually pushed the inmate's intestines back into his body. The inmate, Brett Fields, was forced to wait three days to go to the hospital. He was left partially paralyzed in both legs. The parallels to Baltierra's case are obvious. This

purposeful withholding of necessary medical care is done solely to increase profits, at the expense of providing constitutionally adequate medical care.

***Corizon, nationwide, has a custom, policy, or practice of refusing to send inmates with emergency medical needs to the hospital, acute care facility, or other off-site emergency care provider.***

93. Corizon customarily refuses to transport inmates to life-saving and necessary emergency medical services, so as to keep healthcare costs down at the expense of inmates' lives.

94.  In October 2013, a report in Arizona detailed cases of Corizon's neglect and mistreatment of inmates. In surveys, Corizon nurses in Arizona confirmed the contents of the report and related that patients were deprived of urgent medical care because facilities were understaffed and the limited medical personnel who were available were inadequately trained.

95. In March 2015, the Minnesota Department of Corrections agreed to pay hundreds of thousands of dollars to settle the wrongful death claim of an inmate whose pleas for emergency care were repeatedly ignored by officers and medical staff at a correctional facility. Corizon separately settled with the family and paid an undisclosed amount. The inmate, Jerrell Hammond, had begged corrections officers for help as he suffered from pulmonary blood clots. Prison records showed that Corizon medical staff knew that Mr. Hammond's breathing was worsening for two weeks up to his death and only prescribed him Tylenol. In the hours leading up to his death, Corizon's on-call doctor refused to order Mr. Hammond to be transferred to a hospital emergency room.  Mr. Hammond would die shortly after his pleas for help went unanswered.

96. Corizon had all of the above-described knowledge and notice prior to Baltierra's deliberately indifferent treatment and injuries, which were the result of longstanding,

systemic deficiencies in the medical care provided to inmates by Corizon, as well as the widespread company policies of (1) refusing to provide inmates, regardless of their medical conditions, with physician consultations; (2) refusing to provide inmates with necessary medication and/or treatment; (3) refusing to send inmates with emergency medical needs to the hospital or other off-site providers; and (4) providing deliberately indifferent medical care to inmates suffering from withdrawal.

97. Upon information and belief, Corizon has not: disciplined any of the nurses or Doctor Clower for their conduct that resulted in Baltierra's injury; provided further training to their employees after Baltierra's injury; and/or terminated any of the nurses or Doctor Clower for their conduct that resulted in Baltierra's injury. Corizon ratified the constitutional violation by the individual Defendants by failing to administer any discipline or to take appropriate corrective or remedial action. This is Corizon's custom, policy or practice, as they never dole out discipline to their employees who provide unconstitutional care. Corizon employees know that they will not face discipline for providing inadequate care so as to cut costs.

***Adams County Defendants contracted with Corizon knowing of its custom, policy, and practice of providing unconstitutional, deliberately indifferent care so as to cut costs and increase its profits.***

98. That Corizon routinely prioritizes cost-cutting over basic, adequate medical care to inmates has been well-documented. Adams County Defendants knew or should have known of Corizon's deliberate strategy of cutting costs by, among other things, understaffing facilities, inadequately screening and training employees, denying inmates access to physician consultations, failing to provide necessary medication and/or

treatment, and denying inmates access to needed acute care, placed those in its care at serious risk of grave illness and even death, but they disregarded the wellbeing of the individuals in their custody, with serious consequences for Baltierra among others.

99. At the time of Baltierra's injury, as Adams County Defendants knew or should have known, Corizon medical and healthcare providers nationwide routinely failed to conduct adequate rounds or clinical examinations of their patients, routinely denied patients access to needed doctors and medication, routinely denied inmates necessary transfer to hospital and acute care facilities to meet their emergency medical needs, and failed to follow basic, minimal clinical guidelines for addressing Baltierra's emerging serious medical condition, all of which placed the health and lives of Corizon's patients at risk.

100.     As Adams County Defendants were contracting with Corizon to care for Baltierra and his fellow inmates, other states were cancelling their contracts with Corizon one by one, as they faced the suffering and injurys that Corizon's cost-cutting measures produced. Corizon lost contracts with state prisons in Vermont (2005), Alabama (2007), and Delaware (2010), and with county jails in Galveston County, Texas (2007), Pima County, Arizona (2008), Monroe County, New York (2010), Allegheny County, Pennsylvania (2015), Riker's Island, New York City (2015), and Louisville, Kentucky (2015), almost always following allegations by officials that the company was not providing adequate healthcare. Between 2012 and 2015, Corizon also lost contracts with Minnesota, Maine, Maryland, Tennessee, and Pennsylvania. These contract terminations were followed by others in: New Mexico; Florida; Washington, D.C.; Volusia County, Florida; El Paso, Texas; Chatham County, Georgia; and Santa Barbara County, California, among other jurisdictions.

101.    It was well-established by 2016 that Corizon was customarily and routinely failing to provide care to inmates that met constitutional standards across the country. Adams County Defendants knew, or should have known, of Corizon's systematic failure to provide care rising above deliberate indifference to inmates' serious medical needs. In the face of all of this information, Adams County Defendants opted to contract with Corizon to continue to provide medical services to inmates at ACDF.

102.    Adams County Defendants had all of the above-described knowledge and notice prior to Baltierra's deliberately indifferent treatment and injuries, which were the result of longstanding, systemic deficiencies in the medical care provided to inmates by Corizon, as well as the widespread company policies of: (1) refusing to provide inmates, regardless of their medical conditions, with physician consultations; (2) refusing to provide inmates with necessary medication and/or treatment; (3) refusing to send inmates with emergency medical needs to the hospital or other off-site providers; and (4) providing deliberately indifferent medical care to inmates suffering from withdrawal.

103.    Adams County Defendants have a non-delegable duty to provide constitutionally sufficient medical care to inmates and detainees.


**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment - Failure to Provide Medical Care and Treatment**
**(Against All Defendants)**

104.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth therein.

105.    At all times relevant to the allegations in this Complaint, Defendants were acting under color of state law.

106. 173. Julio Baltierra was a citizen of the United States and all of the individual Defendants are persons under 42 U.S.C. § 1983.

107. Julio Baltierra had a clearly established right under the Fourteenth Amendment to the United States Constitution to be free from deliberate indifference to his known serious medical needs.

108. Each individual Defendant knew or should have known of this clearly established right at the time of Julio Baltierra's injury.

109. At all times relevant to the allegations in this Complaint, each individual Defendant knew of and disregarded the excessive risks associated with Julio Baltierra's serious and life-threatening medical condition.

110. Nevertheless, with deliberate indifference to Julio Baltierra's constitutional right to adequate medical care, as provided by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Defendants knowingly failed to examine, treat, and/or care for Julio Baltierra's worsening condition. They did so despite their knowledge of Julio Baltierra's serious medical needs, thereby placing him at risk of serious physical harm, including injury. Therefore, Defendants knew or were aware that Julio Baltierra faced a substantial risk of harm and disregarded this excessive risk by failing to take measures to reduce it.

111. When Julio Baltierra, and others acting on his behalf, alerted each individual Defendant to his need for medical assistance, Defendants acted with deliberate indifference to Julio Baltierra's readily apparent need for medical attention and his constitutional rights by refusing to obtain and provide any medical treatment for him.

112. All of the deliberately indifferent acts of each individual Defendant were conducted

within the scope of their official duties and employment.

113.    The acts or omissions of each individual Defendant were the legal and proximate
cause of Julio Baltierra's injury.

114.    The acts and omissions of each individual Defendant caused Julio Baltierra damages
in that he suffered extreme physical and mental pain while he was in Defendants'
custody.

115.    The intentional actions or inactions of each individual Defendant as described herein
intentionally deprived Julio Baltierra of due process and of rights, privileges, liberties,
and immunities secured by the Constitution of the United States of America, and caused
him other damages.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment – Municipal Liability
### (Against Adams County Defendants and Corizon)

116.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set
forth herein.

117.    Adams County Defendants and Corizon are persons within the meaning of 42 U.S.C.
§ 1983.

118.    At all times relevant to the allegations in this Complaint, Adams County Defendants
were acting under color of state law and had a non-delegable duty to provide
constitutionality adequate medical care for inmates.

119.    At all times relevant hereto Corizon was willfully a participant in a joint activity and
acting under color of state law, as the legal and functional equivalent of a municipality
providing medical care to inmates.

120.    The intentional acts or omissions of Adams County Defendants and Corizon were

conducted within the scope of their official duties and employment.

121. Corizon's and Adams County Defendants' deliberately indifferent and unconstitutional policies, customs, and/or practices regarding opiate withdrawal and provision of constitutionally adequate medical care as described were the moving and proximate cause of Julio Baltierra's injuries and injury.

122. Corizon and Adams County Defendants deliberately indifferently failed to properly train and supervise their employees to provide necessary medical care to detainees at ACDF.

123. The failures in training, supervision, and policy regarding providing necessary medical assessment and care were so obvious that the failure to provide medical assessment and care was deliberately indifferent to the rights of Julio Baltierra, Plaintiffs, and the public.

124. Corizon's and Adams County Defendants' deliberately indifferent customs, and failures to train/supervise, are all actionable policy decisions that were moving forces and proximate causes of the violation of Julio Baltierra's constitutional rights.

125. The policies, customs, and practices of Corizon and Adams County Defendants as described herein were also moving forces in and proximate causes of the deprivation of Julio Baltierra's right to due process and of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused Plaintiffs other damages.

126. Adams County Defendants are also directly liable for their own policies and actions that are moving forces in this constitutional injury under the contract between Adams County and Corizon, as Adams County and Sheriff Michael McIntosh participated in

negotiating and sponsoring this contract despite the knowledge of Corizon's pervasive pattern of civil rights and human rights violations.

## THIRD CLAIM FOR RELIEF
### § 1983 – Supervisory Liability for Failure to Train and Supervise
### (Against Sheriff Michael McIntosh ("Supervisory Jail Defendants"))

194. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

195. The Supervisory Jail Defendants each have duties to train and supervise deputy sheriffs, nurses and other jail personnel in order to ensure the safety and well-being of detainees in ACDF.

196.    Each of the Supervisory Jail Defendants failed to discharge these duties.

197.    The Supervisory Jail Defendants acted intentionally in failing to adequately train and supervise deputy sheriffs, nurses and other jail personnel.

127.    The Supervisory Jail Defendants' failure to properly train and supervise their subordinate employees was the moving force and proximate cause of the violation of Julio Baltierra's constitutional rights.

128.    The acts or omissions of the Supervisory Jail Defendants caused Julio Baltierra damages in that he suffered extreme physical and mental pain during while he was ignored and denied repeated requests for medical help.

129.    The actions and inactions of the Supervisory Jail Defendants as described herein deprived Julio Baltierra of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused him other damages.

## FOURTH CLAIM FOR RELIEF
### Medical Negligence Causing Serious Bodily Injury
### (Against Corizon, Benjamin Clower, Stephanie Ostrom, Barbara Wisnieska, James

**Froncek, Tara Yellow, Lara Derald, Heather Lynn Flanagan-Wagner, Hannah Palker, Tiffany Jones, Stacy Potter, and Kalee Peterson)**

130. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully forth herein.

131. Corizon is a private corporation that contracts with Adams County Defendants to provide medical care and health services to inmates.

132. Defendants Benjamin Clower, Stephanie Ostrom, Barbara Wisnieska, James Froncek, Tara Yellow, Lara Derald, Heather Lynn Flanagan-Wagner, Hannah Palker, Tiffany Jones, Stacy Potter, and Kalee Peterson are private individuals, and not public officials or employees.

133. Corizon, Benjamin Clower, Stephanie Ostrom, Barbara Wisnieska, James Froncek, Tara Yellow, Lara Derald, Heather Lynn Flanagan-Wagner, Hannah Palker, Tiffany Jones, Stacy Potter, and Kalee Peterson are not entitled to any immunity under the Colorado Governmental Immunity Act ("CGIA") or otherwise.

134. Benjamin Clower, Stephanie Ostrom, Barbara Wisnieska, James Froncek, Tara Yellow, Lara Derald, Heather Lynn Flanagan-Wagner, Hannah Palker, Tiffany Jones, Stacy Potter, and Kalee Peterson are agents of Corizon and their conduct as described herein was engaged in within the scope of their agency.

135. At all times relevant to this action, Julio Baltierra was under the medical responsibility, care, and treatment of Corizon, Benjamin Clower, Stephanie Ostrom, Barbara Wisnieska, James Froncek, Tara Yellow, Lara Derald, Heather Lynn Flanagan-Wagner, Hannah Palker, Tiffany Jones, Stacy Potter, and Kalee Peterson.

136. Benjamin Clower, Stephanie Ostrom, Barbara Wisnieska, James Froncek, Tara Yellow, Lara Derald, Heather Lynn Flanagan-Wagner, Hannah Palker, Tiffany Jones,

Stacy Potter, Kalee Peterson and other care providers had a duty to provide reasonable medical care and treatment to detainees at ACDF, including Julio Baltierra.

137.    Corizon had the duty to exercise reasonable care in the training and supervision of its employees.

138.    These duties of care are informed by state law. For example, under C.R.S. § 16- 3- 401, "persons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation and/or is guaranteed by other legal obligation.

Defendants also had a common law obligation to provide Julio Baltierra with adequate medical treatment and humane care.

139.    Through their actions and omissions, Benjamin Clower, Stephanie Ostrom, Barbara Wisnieska, James Froncek, Tara Yellow, Lara Derald, Heather Lynn Flanagan-Wagner, Hannah Palker, Tiffany Jones, Stacy Potter, Kalee Peterson, and other care providers breached their duty of care when they knowingly failed to assess, monitor, treat and care for Julio Baltierra, despite the fact that he was in obvious need of immediate medical attention.

140.    Stephanie Ostrom, Barbara Wisnieska, James Froncek, Tara Yellow, Lara Derald, Heather Lynn Flanagan-Wagner, Hannah Palker, Tiffany Jones, Stacy Potter, and Kalee Peterson with Julio Baltierra and Benjamin Clower had a doctor-patient relationship with Julio Baltierra at all relevant times and Defendants were acting within the scope of their employment throughout the duration of these relationships.

141.    With respect to their care and treatment of Julio Baltierra, Benjamin Clower, and the

other named Corizon Defendants owed Julio Baltierra a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations. Benjamin Clower, and the other named Corizon Defendant's breached that standard of care and were negligent in failing to properly assess, monitor, treat, and care for Julio Baltierra.

142.     As a direct and proximate result of Benjamin Clower, and the other named Corizon Defendants having breached their duty to provide reasonable medical care and treatment to Julio Baltierra, he suffered significant physical and mental pain and suffering, and other damages, and ultimately was permanently injured as a result.

143.     Corizon is vicariously liable for the negligent acts and omissions by their agents and/or employees, including, but not limited to, those named individually herein, and those directly liable for their own negligent failures in training, policies, and practices.

144.     Corizon is also directly liable because they breached their duty to exercise reasonable care in the training and supervision of their employees and agents in a manner that provided the detainees under their care with reasonable medical care and treatment.

145.     Corizon knew or should have known that the lack of supervision, experience, and training among their employees and agents was likely to harm ACDF detainees in need of medical care, including Julio Baltierra.

146.     In failing to exercise reasonable care in the training and supervision of their employees and agents, as it relates to their providing reasonable medical care and treatment, Corizon was negligent and proximately caused Julio Baltierra's injury.

147.     The negligent acts and omissions by these Defendants were a substantial and significant contributing proximate cause of Julio Baltierra's injury.

148.    As a result of the complained of negligence, Plaintiff hereto have suffered damages, losses, and injuries in an amount to be determined by the jury at trial. These damages include, *inter alia*, pain and suffering, upset, grief, anger, depression, and all other purely non-economic damages as allowed.

149.    Plaintiff suffered and continue to suffer economic and non- economic damages due to Defendants' negligent conduct toward him, respectively, including, but not limited to, financial losses due to the injury of Julio Baltierra, and non-economic damages for depression, impairment in the quality of life, inconvenience, pain and suffering, and extreme emotional distress. Plaintiff is hereto and therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages.

150.    Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regards to the consequences to Julio Baltierra.

151.    Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the injury of another.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and grant:

(a).  Appropriate relief at law and equity;

(b).  Declaratory relief and other appropriate equitable relief;

(c). Economic losses on all claims allowed by law;

(d).  Compensatory and consequential damages, including damages for emotional

distress, humiliation, loss of enjoyment of life, and other pain and suffering on all

claims allowed by law in an amount to be determined at trial;

 (e). Punitive damages on all claims allowed by law and in an amount to be determined

at trial;

 (f).  Attorneys' fees and the costs associated with this action, including expert witness

fees, on all claims allowed by law;

(g).  Pre- and post-judgment interest at the highest lawful rate;

(h).  Any further relief that this Court deems just and proper, and any other relief as

allowed by law.

PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Dated this 20th day of March, 2018.


*s/Benjamin W. Hartford*
Benjamin W. Hartford
The Law Office of Benjamin Hartford LLC
3801 E. Florida Ave. Suite 400
Denver, CO 80210
(303) 991-5757
(303) 522-7573
ben@bhartfordlaw.com